IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re: Arrest Warrant for | ) | Case No. _____ |
| James Bernard Connelly, Jr. | ) | |
|    a/k/a "James B. Connelly, Jr." | ) | **UNDER SEAL** |
|    a/k/a "James Connelly | ) | |
|    a/k/a "Jim Connelly" | ) | |
| | ) | |
| | ) | |
| Federal Bureau of Investigation | ) | |
| Washington Field Office | ) | |

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND APPLICATION FOR
ARREST WARRANT FOR JAMES BERNARD CONNELLY, JR.

I, Timothy D. Lynch, being duly sworn, do hereby depose and state as follows:

**BACKGROUND OF AFFIANT**

1.      I have been employed as a Special Agent (SA) with the Federal Bureau of Investigation for 11 years, conducting numerous investigations involving financial institution fraud, wire fraud, mail fraud, and money laundering, among other violations. I am currently assigned to a sqaud at the FBI's Washington Field Office (WFO) focused on white collar crime and corporate fraud.

**PURPOSE OF AFFIDAVIT**

2.      This affidavit is submitted in support of a criminal complaint and an application for the issuance of an arrest warrant for JAMES BERNARD CONNELLY, JR., also known as James Connelly, Jr., James Connelly, or Jim Connelly (hereinafter "CONNELLY"), a white male with a date of birth of April 8, 1975. I am familiar with the facts set forth in this affidavit based upon my participation in this investigation, information obtained from victim interviews, my review of records, documents, and other evidence obtained during the course of the investigation, and information gained directly

1

from oral and then handwritten statements provided to me in person by Mr. CONNELLY. Because this affidavit is being submitted for the limited purpose of setting forth probable cause, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to charge CONNELLY with wire fraud, in violation of Title 18, United States Code, Section 1343.

## BACKGROUND OF ENTITIES

3. Atlascraft Development, Inc. ("Atlascraft") is a software development firm incorporated in the District of Columbia on December 8, 2003. The founding members or Atlascraft were John M. Stiening ("Stiening") and CONNELLY. Stiening served as Atlascraft's President and Sole Owner, with the primary responsibilities of developing the company's software programs and working directly with clients. CONELLY functioned as Chief Operations Officer ("COO") and Chief Financial Officer ("CFO"), responsible for managing Atlascraft's day-to-day operations in their D.C. office space, as well as managing their corporate accounts.

4. On December 1, 2003, Atlascraft opened a Bank of America ("BOA") business economy checking account on which only Stiening and CONNELLY had signature authority. Stiening signed the account signature card identifying himself as "CEO/Chair of Board." CONNELLY signed the card identifying himself as, "COO/ Sec of Board."

5. In November 2007, Steining was suffering from a serious illness requiring surgery and recovery for the following year and was therefore absent from Atlascraft for a significant period of time in 2008. Stiening had an additional surgery in 2009 and was again absent from Atlascraft for a significant part of that year and while his recovery continued until April 2010. In addition, Stiening's role as company owner often required him to travel overseas and throughout the country on the company's behalf. As a result, Stiening was often absent from Atlascraft's daily operations. During Steining's absences from Atlascraft, CONNELLY had total control of the company, managing both his regular financial duties and the software development team.

## FACTS SUPPORTING PROBABLE CAUSE

6. I have conducted a criminal investigation on behalf of the FBI that has developed evidence showing that, from January 13, 2010, through August 8, 2013, while acting as Atlascraft COO/CFO, CONNELLY wrote 65 unauthorized checks totaling $209,880.49 that were drawn off the Atlascraft corporate BOA account. These checks were comprised of: 45 checks totaling $130,690.49 made out to CONNELLY with no apparent purpose; 19 checks totaling $69,790 made out to CONNELLY for expenses for which he had already been reimbursed; and one (1) check in the amount of $9,400 made out to the U.S. Treasury that was used to pay off CONNELLY's personal 2003 federal tax liability. All of these checks were issued to CONNELLY in excess of any legitimate salary or expense reimbursements he had already received.

## **DISCOVERY OF THE SCHEME**

7. Atlascraft was previously located in a second floor office at 1101 Pennsylvania Avenue SE, Suite 202, Washington, D.C. 20003; Fragers Hardware store occupied the building's first floor. On June 5, 2013, a fire was accidentally started in Fragers that ultimately destroyed the building, to include Atlascraft's second floor office. At the time, CONNELLY had told Stiening that there was approximately $300,000 in the Atlascraft BOA account.

8. On August 19, 2013, Stiening checked the BOA account balance and discovered that it only contained $19,000. CONNELLY told Stiening that this was because the IRS and State of Maryland had overdrawn approximately $80,000 for taxes. CONNELLY also claimed that he expected Atlascraft to receive approximately $700,000 in fire insurance money.

9. On September 3, 2013, an Atlascraft employee failed to receive their salary payment. When Stiening confronted CONNELLY about this, CONNELLY claimed, "I just forgot." Following this, Stiening was unable to get in touch with CONNELLY and obtain any answers regarding Atlascraft's finances. Stiening hired a Certified Public Accountant ("CPA") to review the Atlascraft BOA account and they discovered: 1) $143,491.62 in unauthorized Automated Clearing House ("ACH") transfers made directly from the Atlascraft BOA account to a Visa/Chase credit card in CONNELLY's name; and 2) Numerous checks written to CONNELLY with no apparent explanation and which appeared to be in excess of legitimate salary or business expense reimbursements. From September 3 through 22, 2013, Stiening and Atlascraft's General Counsel made repeated attempts to speak with CONNELLY, with negative results.

4

10. On September 23, 2013, CONNELLY voluntarily appeared at Atlascraft's temporary office to meet with Stiening, Atlascraft's General Counsel, and the hired CPA. The General Counsel asked to record the meeting and CONNELLY agreed. The following is an excerpt from a transcript of this recording in which the Atlascraft General Counsel asked CONNELLY to describe when he began taking money out of the Atlascraft account for himself. As background, CONNELLY's wife's name is Jennifer:

CONNELLY: *Yeah, I said I thought they started in 2011, but um...20-um..., if it was 2010, it was 2010. A number of things happened, (unintelligible), through, like, 2002 to 2007 or eight, I just went through an incredible amount of savings, and I didn't have any more cash available. So, when things were coming up personally, you know, we had issues with the house, Jennifer lost her job a couple of times in those couple of years. It was just, that's what I was, just, covering to live.*

Attorney: So, where has that money gone?

CONNELLY: *Mortgage payments, stuff. I'm mean, just things, just, like, living expenses. We did do a repair to the front of the house*

Later in the transcript there was the following exchange:

Attorney: So, all of this went off to pay off your personal living expenses?

CONNELLY: *Yeah.*

11. On September 25, 2013, an attorney for Atlascraft contacted the FBI's Washington Field Office and filed an official complaint alleging that CONNELLY had embezzled Atlascraft funds. I opened a full criminal investigation, obtained and conducted a full analysis of BOA records for Atlascraft's corporate account and for a personal checking account in CONNELLY's name, and later interviewed CONNELLY.

12. On October 10, 2013, CONNELLY emailed Atlascraft's General Counsel stating his intent to make a small, good faith payment to Atlascraft, but no payment ever arrived. Throughout October 2013, CONNELLY communicated with both Stiening and the Atlascraft General Counsel, indicating his intent to send checks to Atlascraft which never came.

13. On November 19, 2013, Atlascraft received four checks from CONNELLY's personal checking account. The checks were all dated November 13, 2013, and were written in the following amounts:

| Check Number | Amount |
| --- | --- |
| 1211 | $100 |
| 1212 | $200 |
| 1213 | $2,500 |
| 1214 | $2,500 |

CONNELY sent a handwritten note with the checks that appeared to say, *"John, Cash 1211 anytime. Please hold the others for Christmas."* Stiening attempted to cash all four checks, but was unsuccessful.

## CONNELLY INTERVIEW AND WRITTEN STATEMENT

14. On September 19, 2014, I and a Special Agent from Internal Revenue Service –Criminal Investigations ("IRS-CI") interviewed CONNELLY at his residence in Annapolis, Maryland. I advised CONNELLY that he was the subject of an active criminal investigation and that we wanted to interview him regarding his alleged misuse of Atlascraft funds. CONNELLY was advised that he was not under arrest or in custody, did not have to consent to an interview, and was free to end an interview at any time. CONNELLY stated that he wished to cooperate with the investigation and he then submitted to an in-depth interview where he admitted to making numerous unauthorized payments to himself out of Atlascraft's business checking account.

15. CONNELLY estimated that he began making unauthorized payments to himself in approximately 2009 or 2010, *"once every few months at the beginning."* CONNELLY said, *"There were a number of life events that occurred,"* putting his family in debt. CONNELLY claimed that he had leaks in his house and that when his wife, *"lost her job was when things became a problem,"* and he started making more unauthorized payments to himself. CONNELLY stated that he also used funds to help pay tuition for private school for his children.

16. CONNELLY also admitted failing to pay taxes or obtain commercial liability insurance for Atlascraft. Following the June 2013 fire, CONNELLY carbon copied Stiening on emails he appeared to be sending to their insurance company. Asked if he fabricated those emails in order to convince Stiening that he was in contact with the insurance company following the fire, CONNELLY said, *"Yes, obviously yes. I was trying to keep John at bay so I could come up with a potential solution."*

17. Asked why he stopped working for Atlascraft in 2013, CONNELLY stated, *"I was let go,"* for *"financial irregularities."* The June 2013 fire ultimately led Stiening to discover that Atlascraft had no insurance, had not been paying its taxes, and that CONNELLY had been making unauthorized payments to himself. CONNELLY admitted that he had made, *"personal payments to myself,"* and issued *"multiple checks to myself."* Asked if it was true that he had made unauthorized disbursements to himself from Atlascraft's BOA account, CONNELLY said, *"Yes."*

18. At the conclusion of the interview, CONNELLY voluntarily provided the following signed, handwritten statement, witnessed by the agents:

*"I James B. Connelly Jr. ( 8 Ap 75/177 54 7294), voluntarily submits to interview by agents of the FBI/IRS-CI at my house 556 Ferry Point Rd Annapolis MD 21.*

*The agents advised me that I was not under arrest and that I agreed I did not have agree to be interviewed.*

*The agents made no promises to me, and did not intimidate me or threaten me in any way. The agents advised me that they wanted to speak with me regarding a criminal investigation regarding my employment at Atlascraft Development. Knowing this and free to end the interview at anytime,*

*I admitted the following information:*

*I was employed at Atlascraft Development from 2003-2013. I was responsible for the day-to-day operation of the company. All human resource issues, payroll, financial management to include filing of corporate tax returns at the Federal and State levels.*

*Beginning 2009 I began making unauthorized payment to myself from the Atlascraft Development business checking account.*

*I did this primarily in two ways:*

> *-Unauthorized ACH transfers to my VISA/Chase credit card*
>
> *-Making unauthorized business reimbursement checks to myself*
>
> *-Throughout this time period I had failed to file Federal and State employee tax returns*
>
> *-On at least one occasion I used Atlascraft funds to pay for my personal tax liability*

*The situation started when Jennifer lost her job, I never intended to allow the situation to go on year after year.*

*I thought that we would get a handle on our financial position.*

*I understood that I was lacking the core skills to properly manage the Atlascraft tax situation. I knew that the situation was (illegible), but I felt that after we sold the business I could make everything right.*

*Throughout this process I was treated with courtesy and respect.*

*I provided this statement willingly."*

### SALARY PAYMENTS

19. Through interviews with both Stiening and CONNELLY, I learned that both men's salaries were established via verbal agreement. During CONNELLY's interview, he stated that in 2005 he set his Atlascraft salary at approximately $90,000 a year without any consultation with Stiening. CONNELLY stated that this was his salary throughout his time working for Atlascraft, and that it was never inflated.

9

20. A full review of bank records revealed the following salary payments made from the Atlascraft BOA account to CONNELLY's personal BOA checking account. These payments are comprised of either direct deposits made into Connelly's BOA account via QuickBooks accounting software, or Atlascraft BOA checks written to CONNELLY in which the memo section identified a specific pay period:

| Method | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| Check | $16,749.67 | $15,275.39 | $92,281.58 | $22,196.56 |
| Direct Deposit | $71,575.75 | $84,349.57 | $34,687.92 | $32,961.38 |
| **Total:** | **$88,325.42** | **$99,624.96** | **$126,969.50** | **$55,157.94** |

## ACH PAYMENTS TO CONNELLY CREDIT CARD

21. In addition to the above salary payments, CONNELLY enacted the following 48 Automated Clearing House (ACH) electronic transfers totaling $143,491.62 directly from the Atlascraft BOA account to a Visa/Chase credit in CONNELLY's name:

| Year | Amount | # of Transactions |
|---|---|---|
| 2011 | $87,691.62 | 18 |
| 2012 | $30,050.00 | 17 |
| 2013 | $25,750.00 | 13 |
| **Total:** | **$143,491.62** | **48** |

22. A review of CONNELLY's Visa/Chase credit card records revealed that CONNELLY did use this card for a number of business-related expenses. A review of all of CONNELLY's known credit and debit card accounts showed that the $143,491.62 in ACH transfers he received was far in excess of any and all Atlascraft business expenses he incurred.

23. Additionally, a review of CONNELLY's Visa/Chase records showed that he used the ACH transfers to pay off various personal expenses with no connection to Atlascraft business. The following were the top three most expensive items charged to CONNELLY's Visa/Chase credit card:

| Description | Number of Charges | Amount |
| --- | --- | --- |
| South River Golf Links | 43 | $28,382.73 |
| Arhaus Furniture | 5 | $16,351.87 |
| Washington Redskins | 2 | $13,295.60 |

## 65 UNAUTHORIZED CHECKS

24. In addition to the above identified salary and ACH payments, CONNELLY also wrote and signed 65 unauthorized checks totaling $209,880.49 drawn off the Atlascraft BOA account. These checks were in excess of all legitimate salary or reimbursement payments to which CONNELLY would have been entitled.

25. The 65 unauthorized checks were comprised of:

   a. 45 checks totaling $130,690.49 made out to CONNELLY with no apparent purpose

   b. 19 checks totaling $69,790 made out to CONNELLY for expenses for which he would have been reimbursed from the ACH transfers

   c. One (1) check in the amount of $9,400 made out to the U.S. Treasury which CONNELLY admitted he used to pay off his personal 2003 federal tax liability.

## CONCLUSION

26. Based on the foregoing, your affiant believes there is probable cause to believe that between from January 13, 2010, through August 8, 2013, while acting as the COO/CFO of Atlascraft, CONNELLY wrote 65 unauthorized checks totaling $209, 880.49 that were drawn off the Atlascraft corporate BOA account, committing a violation of Title 18, United States Code, Section 1343 (Wire Fraud).

> TIMOTHY D. LYNCH
> SPECIAL AGENT
> FEDERAL BUREAU OF INVESTIGATION

Sworn and subscribed to before me this _____ day of January, 2016.

> United States Magistrate Judge